IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH L. BLAIR, et. al., | : | |
| | : | |
| **Plaintiffs,** | : | Case No. C2-06-450 |
| | : | |
| v. | : | |
| | : | JUDGE MARBLEY |
| LUCENT TECHNOLOGIES INC., | : | |
| | : | |
| **Defendant.** | | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on Defendant's Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), failure to state a claim upon which relief can be granted, and Fed. R. Civ. P. 9(b), failure to plead fraud with sufficient particularity.

For the reasons stated herein, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED.**

### II. BACKGROUND

### A. FACTS

Plaintiffs in this case are thirty-three individuals who worked for Defendant Lucent Technologies Inc. ("Lucent") making telecommunications equipment at Lucent's Columbus Works, a large factory Lucent maintained for many years in Columbus, Ohio.  Plaintiffs' employment ended on June 30, 2001, under the early retirement package ("Special Voluntary Offer" or "SVO") they accepted from Defendant.  This action arises out of the circumstances surrounding the offer and acceptance of that buyout package.

Plaintiffs, at all relevant times during their employment, were represented by Locals 1612 and/or 2020 of the International Brotherhood of Electrical Workers union ("IBEW") and were covered by a collective bargaining agreement ("CBA") negotiated between IBEW and Lucent.  All Plaintiffs had at least ten years of service with Lucent and were all over forty years of age at the time their employment ended.

During 2000 and 2001, Lucent management publicly discussed the possibility of an outsourcing arrangement, whereby Lucent would sell Columbus Works to a contract manufacturer, which would continue to operate the factory to produce products on Lucent's behalf.  Lucent anticipated that some, but probably not all, of the Columbus Works workers would transition to the new manufacturer.  This caused apprehension for the Columbus Works employees, and, therefore, Lucent management held meetings with IBEW leaders as well as with employees directly.  Lucent published a web site including video segments on the "State of the Business" in order to communicate business changes with employees.

Concerned about the effect of outsourcing on its members, IBEW filed a complaint with the National Labor Relations Board alleging unfair labor practices.  The complaint was withdrawn in February 2001 after Lucent and IBEW reached a settlement, termed the "Memorandum of Agreement" ("MoA"), which was incorporated into the CBA.  The MoA guaranteed benefits to any worker whose job was eliminated through outsourcing, but the terms of MoA did not require Lucent to make the MoA binding on any other company merging with Lucent or buying Lucent; the MoA only covered job loss through Lucent's outsourcing.

On May 1, 2001, Lucent made a surprise announcement – not that an outsourcing deal had been struck, as expected, but rather that Lucent planned to eliminate four hundred jobs at Columbus Works.  In hopes of avoiding forced layoffs, on May 11, Lucent announced the

Special Voluntary Offer to all employees.  The SVO provided enhanced benefits to workers who agreed to accept early retirement effective June 30, 2001.  These benefits were essentially the same as those offered under the MoA to employees affected by outsourcing.  In addition, although employees had expected that in the event of outsourcing, Lucent would allow them to transition to similar jobs with the new contract manufacturer operating Columbus Works, the SVO specifically stated that employees accepting it would *not* be given the opportunity to transition to any new contract manufacturer.  It also stated that if an employee accepted the buyout, his or her decision would become irrevocable after 3:00 p.m. on May 29, 2001.

Plaintiffs alleged that also in May 2001, "it became widely known that Lucent was negotiating with a French multinational communications company, Alcatel, which was to result in the latter's absorbing Lucent *in toto.*"  Plaintiffs claim their chief source of information about the rumored merger was the local and national press, because local management refused to provide details about the negotiations.  Plaintiffs heard rumors that Alcatel would close Columbus Works after the merger, and that *all jobs* might be lost, not just the four hundred announced in Lucent's May 1st reduction-in-force plan.  Plaintiffs allege that the source of some of these rumors was Lucent's management.

Plaintiffs claim that they then were faced with an unpleasant choice.  Either they could accept the SVO and voluntarily leave their jobs earlier than they had planned, but with guaranteed benefits, or they could wait to find out how Alcatel would deal with them in the event of a merger.  The danger with a merger, according to Plaintiffs, was that it was possible they would be terminated without receiving: (1) the enhanced MoA benefits (because the new owner did not have to employ the MoA benefits) *or* (2) the SVO guarantees.  Plaintiffs claim they did

3

not want to quit their jobs early, but also did not want to be left empty-handed.  They continued to read the almost-daily news stories and listen inside Lucent for any sign of a merger.

Plaintiffs contend that as the May 29th buyout deadline drew near, rumors of a merger increased.  On May 28th and 29th, Columbus newspapers and the Wall Street Journal reported that negotiations were nearing an end, and merger was imminent, but no details emerged about what might happen to Columbus Works.  Plaintiffs' concerns heightened.  At 1:27 p.m. on May 29th, a communications manager for Lucent e-mailed a Wall Street Journal article about the possible merger to an IBEW president.  Plaintiffs, some of whom had waited until the last hours to accept the SVO, say they felt they were left with no choice but to accept they buyout, based on the news of a likely merger and the risks associated with it.  By the 3:00 p.m. deadline on May 29, 2001, all Plaintiffs had accepted the offer.

Approximately thirty minutes after the deadline passed, Lucent management issued a dramatic news release:  Talks between Alcatel and Lucent had broken down, and there would be no merger.  Plaintiffs allege that Lucent knew the merger discussions had failed at least eighteen hours before the 3:00 p.m. deadline, yet had waited until this time to share the information with its employees.  None of Defendant's pleadings discloses why this information, of obvious interest to the employees of Columbus Works, was not released earlier in the day.

Many Columbus Works employees, including some Plaintiffs, immediately tried to rescind their acceptance of the SVO, but under the offer's express terms, they were denied.  The human resources office, which was normally open until 4:00 p.m., had closed early that afternoon.  A number of Plaintiffs continued to attempt rescission the following day, but were also denied.  Also on May 30th, IBEW and Lucent executives met; IBEW asked Lucent for a twenty-four extension so employees could retract their acceptances, but Lucent refused.  The

pleadings do not disclose whether Plaintiffs made any attempts to engage the formal arbitration practices provided by the CBA, nor do they indicate whether any such attempt was, or would have been, denied or accepted by Lucent.

Lucent's SVO was oversubscribed, so no mandatory layoffs had to be made under its four hundred employee reduction plan.  Lucent accepted the voluntary resignation of 434 production workers and 132 clerical or administrative staff.  Lucent accepted the buyout applications based on seniority, so that those with the most years of service were accepted first. On June 30, 2001, these employees' employment relationship with Lucent came to an end.

In June 2001, Lucent continued negotiating with Celestica, a contract manufacturer it had considered to run Columbus Works.  As part of a further force reduction plan, Lucent made another buyout offer to its employees.  This time, the offer included an additional bonus of $15,000 and the opportunity to continue employment with the new contract manufacturer.[1] Plaintiffs, having already accepted the SVO, were not eligible to participate in this second offer.


### B. PROCEDURAL HISTORY

Plaintiffs filed their Amended Complaint in the Franklin County Court of Common Pleas on May 11, 2006, alleging that Defendant committed both age discrimination under Ohio law, and common-law fraud when it offered the SVO and accepted Plaintiffs' resignation under the buyout.  Defendant removed the case to this Court on June 12, 2006 under diversity jurisdiction. On June 30, 2006, Defendant filed its Motion to Dismiss; Plaintiffs filed their Response in Opposition on August 7, 2006, and Defendant submitted its Reply on August 25, 2006.  On

---

[1]     According to Plaintiffs, Celestica began operating Columbus Works but essentially shut it down by the end of 2002, and sold the factory back to Lucent for $25 million.

5

September 12, 2006, with leave of the Court, Plaintiffs filed their Surreply to Defendant's Reply. Accordingly, this matter is now ripe for this Court's consideration.

### III. STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, this Court is limited to evaluating whether a plaintiff's complaint sets forth allegations sufficient to make out the elements of a cause of action. *Windsor v. Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983). A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the [p]laintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). This Court must "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Conley*, 355 U.S. at 45-46. While the complaint need not specify every detail of a plaintiff's claim, it must give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). While liberal, this standard of review does require more than the bare assertion of legal conclusions. *Allard v. Weitzman* (*In re DeLorean Motor Co.*), 991 F.2d 1236, 1240 (6th Cir. 1993). A complaint must contain either direct or inferential allegations with respect to all the material elements necessary to sustain recovery under some viable legal theory. *Scheid v. Fanny Candy Shop Inc.* 859 F.2d 434, 437 (6th Cir. 1988).

### IV. LAW AND ANALYSIS

Plaintiffs have made two claims against Defendant: (1) age discrimination under Ohio law, O.R.C. § 4112.14, and (2) common-law fraud.  Defendant now moves this Court to dismiss both claims.

### A. Claim I (Age Discrimination)

In Claim I of their Amended Complaint, Plaintiffs seek damages under Ohio's age discrimination statute, Ohio Revised Code § 4112.14.  Section (B) of that law provides a cause of action to any employee aged forty years or older who has been discharged, without just cause, on account of the employee's age, and provides that damages including reinstatement, lost wages and benefits, and costs, including attorney's fees, are available as compensation for discrimination.  Section (C), the "arbitration exhaustion" requirement, however, provides that the cause of action is not available where "the employee has available to the employee the opportunity to arbitrate the discharge or where a discharge has been arbitrated and has been found to be for just cause."  Defendant seeks to dismiss Plaintiffs' age discrimination claim because Plaintiffs did not take advantage of the opportunity to arbitrate provided by the CBA.

An employer who eliminates workers solely on account of age commits age discrimination.  *Mauzy v. Kelly Servs.,* 75 Ohio St. 3d 578, 582 (1996).  In this case, Lucent accepted the voluntary resignation of workers with the most years of employment first.  Plaintiffs claim that this practice operated as a proxy for eliminating workers by their age, because workers with a long employment history at Lucent would naturally be among the oldest employees.  Plaintiffs allege that Lucent's scheme was secretly designed with the intent to secure

7

the resignations of the oldest workers, who were the costliest to employ, and was therefore a

subtle but effective form of age discrimination.[2]

Defendant Lucent claims that Plaintiffs failed to take advantage of any formal arbitration

or grievance process that allegedly was provided by the CBA between Lucent and IBEW, and

therefore, cannot bring an age discrimination suit under Ohio law.  Plaintiffs do not dispute that

they did not engage in any formal arbitration proceedings, but urge this Court to consider the

significance of the May 30, 2001 meeting between Lucent and IBEW, in which IBEW asked for

time to allow its members to rescind their SVO buyout elections, and Lucent refused to grant

such an extension.  This informal request by one party, made during the course of a meeting

without neutral arbitrators, however, does not rise to the level of "arbitration" under the clear

language of the CBA, because the CBA contemplates the submission of a dispute to a neutral

"Arbitrator."  This conclusion is supported by the fact that Plaintiffs did not label the May 30th

meeting as "arbitration" in their Amended Complaint.

Having found that no arbitration took place, this Court must consider whether there was

"available . . . the opportunity to arbitrate the discharge" under the language of O.R.C. § 4112.14

(C).  If arbitration *was available*, and Plaintiffs did not avail themselves of it, then the statute

would bar their claim of age discrimination.

With respect to § 4112.14, an "opportunity" to arbitrate means that the discharged

employee had access to an arbitration procedure.  *York v. A.K. Steel Corp.*, No. C-1-04-250,

2005 U.S. Dist. LEXIS 31846, at *20 (S.D. Ohio Dec. 8, 2005).  In *York*, facing similar facts,

---

[2]    Plaintiffs also allege that this was a cunning maneuver to invert the CBA's seniority rules, which normally required the discharge of the least-senior employees first during any *involuntary* layoff.

this Court addressed the same statute and found that when arbitration is provided under a

collective bargain agreement, employees have the "opportunity to arbitrate."  *Id.*

Plaintiffs argue that their claim should survive because arbitration was not available to

them for four reasons: 1) the CBA, by its terms, did not provide a mechanism to arbitrate the age

discrimination claim; 2) the CBA applied to the resolution of disputes between Lucent and

IBEW, not those between Lucent and private individuals; 3) the MoA exempted any arbitration

requirement, regardless of whether the CBA provided for arbitration; and 4) even if arbitration

were possible, there was no unanimity between the parties about whether a "discharge" had

occurred.  This Court will address each reason in turn.

Plaintiffs' first argument is that the CBA did not provide a mechanism to arbitrate any

dispute sounding in age discrimination.  In their Opposition to Defendant's Motion to Dismiss,

Plaintiffs ask this Court to review two CBA provisions.  Plaintiffs urge that Article 7, governing

arbitration, speaks only to 'disciplinary dismissal.'  Additionally, Plaintiffs maintain that the

dismissal definition in Article 3 (g) does not extend to workers' acceptance of voluntary buyout

offers such as the one in this case.  Under Plaintiffs' reading of the CBA, then, arbitration is only

available for disciplinary dismissal, and not for Plaintiffs' acceptance of the SVO.

Plaintiffs' reasoning, however, rests upon a false premise.  This Court has reviewed the

CBA and finds that Article 7 addresses "[a]ny dispute arising between the UNION and the

COMPANY," not just "disciplinary dismissals" as Plaintiffs urge.  Article 7 then sorts disputes

into three separate categories for arbitration purposes: (a) "Disciplinary DISMISSAL,

Suspension and INTERIM STATUS"; (b) "Local Contract Interpretation Issues"; and (c)

"National Contract Interpretation Issues."  The CBA sets out different arbitration procedures for

each category.  Plaintiffs' argument that only a disciplinary dismissal is arbitrable is, therefore,

without merit.  The CBA provides that arbitration is available for "any dispute" between Lucent and IBEW.  On May 30, 2001, IBEW met with Lucent to ask for an extension of time for its members to rescind their SVO elections.  Because IBEW registered its dispute with Lucent on behalf of all workers, including Plaintiffs, this was an issue which IBEW could have chosen to arbitrate on behalf of Plaintiffs and other affected employees.

Plaintiffs' second argument is that the CBA governs disputes between Lucent and IBEW, but not between Lucent and private individuals.  Plaintiffs argue that after Lucent accepted their buyout elections, they "thereafter ceased to be members of the bargaining unit" and were therefore without standing to arbitrate any disputes.  In other words, Plaintiffs argue that even if IBEW had the opportunity to arbitrate the dispute, pursuant to the CBA, Plaintiffs did not have such opportunity because they were no longer part of the union as employees.

Plaintiffs argument rings hollow.  They correctly indicate that arbitration, under Article 7 of the CBA, governs a dispute arising between IBEW and Lucent, not between individuals and Lucent.  However, Plaintiffs' argument that they had no opportunity to arbitrate their age discrimination claim implies that, by virtue of accepting the SVO, they were no longer members of IBEW, and IBEW could not enter arbitration on Plaintiffs' behalf.  This position is inconsistent with the fact that IBEW did intercede, on May 30, 2001, on the behalf of hundreds of similarly situated employees after their SVO elections were accepted.  Plaintiffs essentially ask this Court to construe an acceptance of Lucent's SVO as containing an implicit dissociation from IBEW, even though Plaintiffs continued to work with IBEW representation until the June 30, 2001 termination date.  In addition, the CBA contemplates IBEW representing dismissed employees in arbitration proceedings.  As such, this Court finds that Plaintiffs had the ability to arbitrate their claims.

Plaintiffs' third argument is that the February 2001 MoA exempts them from any requirement in the CBA to arbitrate disputes.   Both parties agree that the MoA was made a part of the CBA when it was signed, and that the MoA agreement was reached in the context of IBEW concerns that management would begin outsourcing production from Columbus Works. Plaintiffs argue, in their Opposition, that Paragraph 7 of the MoA relieves them from any arbitration requirement.  Plaintiffs omit subparagraphs 1 through 4 of Paragraph 7 "for brevity's sake."

Paragraph 7, however, has nothing to do with the arbitrability of age discrimination claims, and exempts from arbitration only violations of the "information sharing process" under which Lucent agreed to keep IBEW informed of its moves.  Subparagraph (1) of Paragraph 7 adds a provision to the CBA which provides that "[p]rior to any decision to subcontract or outsource bargaining unit work, [Lucent] will provide [IBEW] with written notice" that it intends to do so.  Subparagraph (2) commits Lucent to meeting with IBEW on a regular basis while outsourcing remains a possibility.  Subparagraph (3) provides that Lucent would not make any final decision to outsource work until IBEW had notice of Lucent's intent.  Subparagraph (4) provides that no earlier agreements between the parties were superceded.  Nowhere does Paragraph 7 address age discrimination claims.

Subparagraph (5), which Plaintiffs *did* include in their brief, indicates that violations of subparagraphs (1), (2), (3), and (4) would not go through the normal CBA arbitration process, but rather, through an alternate dispute resolution process described in that same subparagraph.

The Court finds that nothing in Paragraph 7, or the rest of the MoA, exempts individuals claiming age discrimination violations from invoking the arbitration process.  While it is true that employees receiving the SVO buyout package were getting substantially similar benefits to

those contained in the MoA, there is nothing before this Court to suggest that arbitration of age discrimination claims would be excused by the MoA's Paragraph 7.[3]

Plaintiffs' fourth and final argument against the applicability of the arbitration requirement to their age discrimination claim is that "before one can even employ the CBA, assuming *arguendo* its applicability, there must be unanimity between the parties regarding whether a 'discharge' has even taken place."  Plaintiffs urge that Lucent would never have entered arbitration because it "perpetually denied that a 'discharge' ever occurred."

This argument is essentially a restatement of Plaintiffs' first argument: that the prospect of arbitration was unavailable to them because no disciplinary discharge occurred.  But, as previously discussed, the CBA would have covered "any dispute" between IBEW and Lucent; whether the label "discharge" can be applied to what took place between Lucent and Plaintiffs is immaterial.  Nothing in the pleadings indicates that Plaintiffs pursued arbitration in any way, and this Court will not construe O.R.C. § 4112.14 (C)'s arbitration exhaustion requirement to permit a plaintiff to make his or her own determination about an employer's willingness to arbitrate without attempting to do so, particularly when the opportunity was readily available.[4]

Because this Court finds that Plaintiffs did not attempt arbitration even though it was available to them, Plaintiffs' age discrimination claim is barred by the arbitration exhaustion requirement of O.R.C. § 4112.14 (C).

Therefore, this Court **GRANTS** Defendant's Motion to Dismiss Claim I of Plaintiffs' Amended Complaint.

---

[3]    Even if Paragraph 7's alternate dispute resolution process did apply, Plaintiffs have not indicated any attempt to use that process, which would also be a prerequisite to satisfy O.R.C. § 4112.14 (C).

[4]    If Plaintiffs had in fact attempted to arbitrate their claims and were denied by Lucent, because of, for example, a disagreement over whether a discharge occurred, then by its terms, O.R.C. § 4112.14 (C)'s "opportunity to arbitrate" language would pose no bar now.

**B. Claim II (Fraud)**

Plaintiffs allege in Claim II that Lucent fraudulently induced them to accept the SVO by deceiving them about the status of the rumored Alcatel merger until after the SVO election deadline had passed.  Plaintiffs claim damages arising from: (1) giving up their jobs, wages and benefits as a result of accepting the SVO buyout, and (2) missing out on the additional $15,000 bonus and chance to work for the new contract manufacturer in Lucent's second, substantially similar buyout offer made after Plaintiffs had left the company.

Defendant Lucent opposes this claim on multiple grounds: (1) This claim is barred by Ohio's four-year statute of limitations; (2) Federal labor laws preempt any state-law fraud claim; and (3) Plaintiffs have failed to state the requisite elements of a fraud claim.  Defendant also urges the Court to dismiss the claim for repleading under Fed. R. Civ. P. 9(b), requiring allegations of fraud to be stated with particularity.

Ohio Revised Code § 2305.09 provides a statute of limitations applicable to certain tort actions.  It states, *inter alia*, that "[a]n action for any of the following causes shall be brought within four years after the cause thereof accrued: . . . (C) For relief on the ground of fraud."  It also states that, specifically with respect to fraud, "the causes thereof shall not accrue . . . until the fraud is discovered."  This is known as the discovery rule, which prevents the statute of limitations from running until the plaintiff discovers that a fraud has been perpetrated.  *See, e.g., Harris v. Liston*, 86 Ohio St.3d 203, 207 (1999).

In this case, the fraud claimed by Plaintiffs is Defendant's alleged withholding of the knowledge that the merger discussions had collapsed at least eighteen hours before the 3:00 p.m. May 29, 2001 SVO deadline.  Therefore, under the four year statute of limitations, Plaintiffs concede that their fraud action "[i]n the ordinary course . . . would have had to have been

13

brought by May 29, 2005 or shortly thereafter." Yet Plaintiffs attempt to save their fraud claim under the § 2305.09 discovery rule. Plaintiffs, however, misunderstand the contours of the discovery rule, which provides that a cause of action for fraud begins to accrue only upon the discovery that a fraud has been committed; it does not state, as Plaintiffs contend, that the statute of limitations begins to accrue only when Plaintiffs have had a chance to discover the fraud's precise mechanisms.

The discovery rule is premised upon the principle that a wrongdoer "is not permitted to avail himself of his own wrong" by concealing the fact of a fraud's commission from the victim. *Kettering v. Berger*, 4 Ohio App. 3d 254, 261 (Ohio Ct. App. 1982). In other words, the rule preserves the claims of those who have been wronged without their knowledge, but does not permit the knowingly injured to sleep on their rights.

For example, in *Kettering v. Berger,* a municipal court judge stood accused of pocketing the fees he collected from the performance of marriage ceremonies, rather than turning them over to the clerk of courts. The defendant argued, among other things, that the statute of limitations for fraud had run. The Ohio Court of Appeals remanded the case, for consideration of the date that other city officials first discovered the scheme's existence. The court reasoned that if city officials had known of the scheme for over four years, they would be barred from bringing an action. The "discovery date," therefore, was the day that the officials first learned of the scheme, not the day that the officials realized precisely how the scheme operated.

Courts have employed the discovery rule even in cases where the plaintiffs did not bring suit for over a decade because the plaintiffs had no way to discover the alleged fraud. *See, e.g., Burr v. Stark County Bd. of Commrs.*, 23 Ohio St. 3d 69 (1986). In *Burr*, a married couple sought to adopt a child. In 1964, the county welfare department introduced the Burrs to a child

14

described as a "healthy[] baby boy," who had been born to an eighteen-year-old single woman;

the Burrs decided to adopt him.  Tragically, the baby's condition deteriorated as he grew up, and

he suffered from life-threatening physical and psychological problems.  Only after unsealing the

adoption records in 1982 did the Burrs discover the truth: he had not been born at the city

hospital, but at the state mental institution, to a thirty-one year old mental patient suffering from

psychotic delusions.  The Burrs sued the county welfare department for fraud, and the Ohio

Supreme Court held that the cause of action for fraud began to accrue from 1982, *upon the*

*victims' discovery that a fraud had been committed,* not in 1964, when the fraud was perpetrated.

In these cases, the actions constituting the alleged frauds had been concealed by the

defendants in such a way that the plaintiffs had no way of knowing that the defendants had

committed any frauds.  In this case, however, the only action giving rise to Plaintiffs' claim of

fraud was the alleged deliberate withholding of information by Lucent that the merger talks had

failed until after the SVO deadline.  If this withholding was the key to the allegedly fraudulent

scheme – which is what Plaintiffs have alleged here – then such withholding should have been

readily apparent to Plaintiffs on the day of the buyout deadline, May 29, 2001, because that is

also the day that Lucent disclosed that it had the information.  On that day, the fact of alleged

injury through fraud became known, and Plaintiffs were then entitled to bring their action based

on that known injury.  Plaintiffs in this case did not need years to discover what had happened,

as in the *Burr* case.

Plaintiffs argue that they did not receive information regarding a necessary element of

their fraud claim until May 2005, during depositions taken by plaintiffs in a separate litigation.

Plaintiffs' reply brief states that, prior to the 2005 depositions, Plaintiffs "did not have access to

sufficient facts to warrant a legally sustainable allegation of fraud," which is why their action

was filed more than four years after the allegedly fraudulent conduct.  Plaintiffs have

misinterpreted the discovery rule and are essentially urging this Court to give Plaintiffs time to

discover enough facts to warrant a "legally sustainable" action *before* the statute of limitation

begins to run.  However, this is the purpose of the discovery phase of litigation, which begins

*after* a complaint is filed.

Further, Plaintiffs' central argument with respect to the 2005 depositions is that they did

not comprehend in 2001 the means by which they were defrauded, and that not until 2005 did

they actually learn how the alleged fraud worked.  Plaintiffs' own briefs belie this assertion.

Plaintiffs admit that local Lucent management released information of the failed merger to them

about thirty minutes after the 3:00 p.m. deadline on May 29th.  In their reply, Plaintiffs submit

that "[i]t is clear from other documents [that company] management had been aware earlier in

the week" that the Alcatel merger might fail.  Plaintiffs also say that "Lucent's CEO announced

to all the employees by video on May 30, 2001 that the Alcatel talks had collapsed earlier in the

week."  Since the alleged fraud turned on Lucent knowing the merger had failed and then

deliberately withholding that information until it was too late for Plaintiffs to act on it, any of

these documents or announcements would have given Plaintiffs enough ground on which to

plead an action for fraud in 2001.  Plaintiffs did not need to wait until the 2005 depositions had

been taken.  Indeed, had they filed their action in 2001, they would have proceeded to the

discovery process in which they could have taken similar or identical depositions.

Further, to support their claims that Lucent management fraudulently withheld

information from them, Plaintiffs have introduced into the record a copy of a news article from

the CNN news web site, dated 4:27 a.m. on May 29, 2001, quoting a Lucent spokesman's

statement that merger talks had failed.  Plaintiffs, who say they relied solely on the local and

national press to make their decisions, were arguably on public notice about the merger's failure as of May 29, 2001. If Lucent was fraudulently inducing Plaintiffs to accept the SVO, even after such public statements, Plaintiffs were on notice of the alleged fraud at that time.

While Ohio courts will permit liberal application of the discovery rule in cases where plaintiffs do not learn of their own injuries immediately, *see Melnyk v. Cleveland Clinic,* 32 Ohio St. 2d 198 (1972) (medical forceps left inside patient not discovered until years later); *NCR Corp. v. United States Mineral Prods. Co.*, 72 Ohio St. 3d 269, 271 (1995) (asbestos litigation where both parties agreed to apply the discovery rule because condition was not discovered until years had passed), Plaintiffs here *did* know immediately what injury they had allegedly suffered: Lucent's irrevocable acceptance of their decisions to resign. This is evidenced by their immediate attempts to rescind those decisions. No Plaintiff in this action may complain that the harm was undetectable. Far from being injured in secret, all Plaintiffs were acutely knowledgeable about the injury of which they now complain.

In conclusion, this Court finds that O.R.C. § 2305.09's four-year statute of limitations for fraud actions has run because the cause of action began to accrue in May 2001, and Plaintiffs did not file suit until May 11, 2006.

Defendant also argues that Plaintiffs' fraud claim is barred by the federal Labor Management Relations Act, that Plaintiffs have failed to establish all elements of their claim, and that Plaintiffs failed to plead their claim with sufficient specificity. Because Defendant's motion has been resolved on other grounds, this Court need not reach such arguments.

Therefore, this Court **GRANTS** Defendant's Motion to Dismiss Claim II of Plaintiffs' Amended Complaint.

## V. CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED.**

**IT IS SO ORDERED.**

                                  **s/Algenon L. Marbley**
                             **ALGENON L. MARBLEY**
                             UNITED STATES DISTRICT JUDGE

**DATED: March 20, 2007**